NIGHT BOX
~~FILED~~

UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

2006 OCT -2   PM 4: 53

MIDDLE          COURT
                FLORIDA

UNITED STATES OF AMERICA,
f/u/b/o HERVE CODY
d/b/a HERVE CODY CONTRACTOR

Plaintiff,

6:06cv1541-Orl-19-KRS

CASE NO:_____

DIVISION:_____

v.

ESA ENVIRONMENTAL SPECIALISTS, INC.,
a foreign corporation and
FIDELITY AND DEPOSIT COMPANY OF
MARYLAND, a surety company,

Defendants.

_____/

## COMPLAINT

Plaintiff, United States of America, for the use of Herve Cody d/b/a Herve Cody

Contractor, ("Herve Cody") hereby sues the Defendants, ESA Environmental Specialists,

Inc. and Fidelity and Deposit Company of Maryland and states:

## GENERAL ALLEGATIONS

1.      Use Plaintiff is a sole proprietorship owned and operated by Herve Cody

principally doing business in the State of North Carolina.

2.      Defendant, ESA Environmental Specialists, Inc. ("ESA"), is a corporation

incorporated under the laws of the State of Texas, having its principal place of business in

the State of North Carolina.

3.      Defendant, Fidelity and Deposit Company of Maryland, ("F & D"), is an insurance company authorized to issue bonds in the state of Florida.

4.      At all material times, Defendant ESA was the general contractor under a contract with the United States Army Corps of Engineers ("COE") for a project known as the Kenansville Lake Drainage Project (the "Project").  Pursuant to the contract with the COE, ESA was required to provide a payment bond under the Miller Act.

5.      F & D is the surety on the payment bond required on the project, a copy of said bond being attached hereto as Exhibit "A" and incorporated herein by reference.

6.      On or about November 7, 2005, ESA contracted with Use Plaintiff, Herve Cody, for Herve Cody to provide materials and labor for the subject project, a copy of said contract attached hereto as "Exhibit B" and incorporated herein by reference.

7.      Herve Cody provided materials and labor and performed the work in accord with Exhibit B until June 30, 2006.

8.      All conditions precedent to bringing this action have been performed, have occurred, or have been waived.


**COUNT I**
**(Claim against F & D and ESA under the Miller Act)**

9.      The Use Plaintiff hereby incorporates the allegations of Paragraphs 1 through 8 as if set forth fully herein.

10.     This Court has jurisdiction of the count against the Defendants, F & D and ESA under 28 U.S.C. § 1331, pursuant to claims under the Miller Act, 40 U.S.C. § 3133(b)(3)(B), as well as under 28 U.S.C. § 1367(a) .

11.    Herve Cody began work on the Project on or about January 11, 2006.

12.    Herve Cody continually and satisfactorily prosecuted the work in accordance with its contract with ESA.

13.    Herve Cody has submitted five (5) pay applications to Defendant ESA for payments in accord with the terms of the contract with Defendant ESA.

14.    The total amount billed by Herve Cody is $1,632,534.80.

15.    As of July 10, 2006, Defendant ESA has been paid by the COE a total of $1,426,685.75.

16.    In seeking payment from the COE on its third payment application, on June 20, 2006, Defendant ESA presented the COE a Progress Payment Certification, wherein Defendant ESA falsely represented to the government the following three statements:

> a) that payments to subcontractors and suppliers had been made from previous payments received under the Contract;
>
> b) that timely payments will be made from the proceeds of the payments covered in the certification; and
>
> c) that the request did not include any amount which the prime contractor intended to withhold or retain from a subcontractor or supplier in accordance with the terms and conditions of the subcontract.

17.    Defendant ESA's statements to the COE were false because ESA had not made payments to Herve Cody from previous payments that ESA received from the COE

except for a payment of $356,124.75 on a payment application in which Herve Cody was seeking payment of over one million dollars ($1,000,000.00). As to the withholding of the remainder of the payment, Defendant ESA gave no explanation as to why the full amount was not paid.

18.     Defendant ESA's statements to the COE were false also because ESA did not make timely payments to Herve Cody from the proceeds of the payments covered in the certification.

19.     No monies were paid to Herve Cody after Defendant ESA received payment on or about July 10, 2006, which were covered by the certification.

20.     Defendant ESA's statements to the COE were false also because the request did contain monies that ESA intended to and did withhold from Herve Cody after ESA received payment on or about July 10, 2006.

21.     The total amount unpaid, which is currently due and owing to Herve Cody for labor and materials supplied to the project, is $1,276,410.05.

22.     Ninety (90) days have passed since Herve Cody last furnished labor or materials for the Project, and Herve Cody remains unpaid.

23.     Herve Cody has complied with all provisions of the Miller Act.

24.     Defendant ESA and Defendant F & D are jointly and severally responsible for the total amount due and owing to Herve Cody, along with all prejudgment interest.

25.     Herve Cody has retained the services of the attorneys filing this action and is obligated to pay said attorneys a reasonable fee for their services.

26.     Pursuant to Florida Statutes section 627.428, as incorporated into Florida Statutes section 627.756, Defendant F & D is liable for attorneys' fees.

WHEREFORE, Use Plaintiff, Herve Cody, demands judgment in its favor and against Defendant ESA and Defendant F & D, jointly and severally, for the total amount of the principal balance due and owing, together with prejudgment interest and costs, as well as an award of attorneys' fees against Defendant F & D and any and all other further relief as the Court deems just and proper under the circumstances.

## COUNT II
### (Breach of Contract Against ESA)

27.     Herve Cody hereby incorporates the allegations of Paragraphs 1 through 8 as if fully set forth herein.

28.     The Court has supplemental jurisdiction over this count against Defendant ESA pursuant to 28 U.S.C. § 1367(a).

29.     A Notice to Proceed was issued on or about November 1, 2005.

30.     Based on said Notice to Proceed, Herve Cody rented equipment, which equipment was mobilized and then forced to be idle due to Defendant ESA's delay in furnishing the COE job startup submittals.

31.     Herve Cody was not able to begin work on the Project until approximately January 11, 2006.

32.     Once work began, Herve Cody competently performed the work required by its contract with Defendant ESA.

33.    Herve Cody has submitted five (5) pay applications to Defendant ESA for payments in accord with the terms of the contract with Defendant ESA.

34.    The total amount billed by Herve Cody is $1,632,534.80.

35.    As of July 10, 2006, Defendant ESA has been paid by the COE a total of $1,426,685.75.

36.    Defendant ESA has made one payment to Herve Cody in the amount of $356,124.75, without any explanation as to why the full amount was not paid.

37.    The total amount unpaid, which is currently due and owing to Herve Cody for labor and materials supplied to the project, is $1,276,410.05.

38.    Defendant ESA has breached its contract with Herve Cody by:

    a)  failing to make progress payments within ten working days after ESA received payment from the COE, and by

    b)  failing to properly perform its scope of work with the COE and failing to notify Herve Cody of the impact of such failure to the project schedule.

39.    The contract between Herve Cody and Defendant ESA provides for recovery of reasonable attorneys' fees incurred in bringing suit on the contract.

40.    Herve Cody has retained the services of the attorneys filing this action and is obligated to pay said attorneys a reasonable fee for their services.

WHEREFORE, Use Plaintiff, Herve Cody, demands judgment in its favor and against Defendant ESA for the total amount of the principal balance due and owing, together with damages stemming from the initial delay, along with prejudgment interest

thereon, as well as attorneys' fees and costs, and any and all other further relief as the Court deems just and proper under the circumstances.

Dated September 29, 2006

CURTIS L. BROWN, ESQUIRE
Florida Bar Number: 0856312
LANA LARSON DEAN, ESQUIRE
Florida Bar Number: 224420
*Wright, Fulford, Moorhead & Brown, P.A.*
Post Office Box 2828
Orlando, Florida 32802-2828
(407) 425-0234/fax (407) 425-0260
Attorneys for Plaintiff

Bond No. 08813827

| PAYMENT BOND<br>(See instructions on reverse) | DATE BOND EXECUTED (Must be same or later than date of contract)<br><br>4 October 2005 | OMB No.:9000-0045 |
|---|---|---|

Public reporting burden for this collection of information is estimate to average 25 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to the FAR Secretariat (MVR), Federal Acquisition Policy Division, GSA, Washington, DC 20405

**PRINCIPAL** (Legal name and business address)

ESA Environmental Specialists, Inc.
1100 South Mint Street, Suite 100
Charlotte, NC 28203-3404

**TYPE OF ORGANIZATION** ("X" one)

☐ INDIVIDUAL          ☐ PARTNERSHIP

☐ JOINT VENTURE       ☒ CORPORATION

STATE OF INCORPORATION

Texas

**SURETY(IES)** (Name(s) and business address(es))

Fidelity and Deposit Company of Maryland
Post Office Box 1227
Baltimore, MD 21203

**PENAL SUM OF BOND**

| MILLION(S) | THOUSAND(S) | HUNDRED(S) | CENTS |
|---|---|---|---|
| 2 | 273 | 701 | 00 |

| CONTRACT DATE | CONTRACT NO. |
|---|---|
| 29 September 2005 | W912EP-05-C-0036 |

**OBLIGATION:**

We, the Principal and Surety(ies), are firmly bound to the United States of America (hereinafter called the Government) in the above penal sum. For payment of the penal sum, we bind ourselves, our heirs, executors, administrators, and successors, jointly and severally. However, where the Sureties are corporations acting as co-sureties, we, the Sureties, bind ourselves in such sum "jointly and severally" as well as "severally" only for the purpose of allowing a joint action or actions against any or all of us. For all other purposes, each Surety binds itself, jointly and severally with the Principal, for the payment of the sum shown opposite the name of the Surety. If no limit of liability is indicated, the limit of liability is the full amount of the penal sum.

**CONDITIONS:**

The above obligation is void if the Principal promptly makes payment to all persons having a direct relationship with the Principal or a subcontractor of the Principal for furnishing labor, material or both in the prosecution of the work provided for in the contract identified above, and any authorized modifications of the contract that subsequently are made. Notice of those modifications to the Surety(ies) are waived.

**WITNESS:**

The Principal and Surety(ies) executed this payment bond and affixed their seals on the above date.

| ESA Environmental Specialists, Inc. | | PRINCIPAL | | | |
|---|---|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | 3. (Seal) | | Corporate Seal |
| NAME(S) & TITLE(S) (Typed) | 1. Nadeem Bandar/pa. | 2. | 3. | | |

| | INDIVIDUAL SURETY(IES) | | |
|---|---|---|---|
| SIGNATURE(S) | 1. (Seal) | 2. (Seal) | |
| NAME(S) (Typed) | 1. | 2. | |

| | CORPORATE SURETY(IES) | | | | |
|---|---|---|---|---|---|
| SURETY A | NAME & ADDRESS | Fidelity and Deposit Company of Maryland | STATE OF INC. Maryland | LIABILITY LIMIT $ | Corporate Seal |
| | SIGNATURE(S) | 1. Tammy A Ward | 2. | | |
| | NAME(S) & TITLE(S) (Typed) | 1. Tammy A. Ward, Attorney-in-Fact | 2. | | |

AUTHORIZED FOR LOCAL REPRODUCTION
Previous edition is usable

STANDARD FORM 25A (REV. 10-98)
Prescribed by GSA-FAR (48 CFR) 53.2228(c)

PLAINTIFF'S
EXHIBIT

"A"

Bond No. 13827


ZURICH

# THIS IMPORTANT DISCLOSURE NOTICE IS PART OF YOUR BOND

We are making the following informational disclosures in compliance with The Terrorism Risk Insurance Act of 2002. No action is required on your part.

## Disclosure of Terrorism Premium

The premium charge for risk of loss resulting from acts of terrorism (as defined in the Act) under this bond is $__waived__. This amount is reflected in the total premium for this bond.

## Disclosure of Availability of Coverage for Terrorism Losses

As required by the Terrorism Risk Insurance Act of 2002, we have made available to you coverage for losses resulting from acts of terrorism (as defined in the Act) with terms, amounts, and limitations that do not differ materially as those for losses arising from events other than acts of terrorism.

## Disclosure of Federal Share of Insurance Company's Terrorism Losses

The Terrorism Risk Insurance Act of 2002 establishes a mechanism by which the United States government will share in insurance company losses resulting from acts of terrorism (as defined in the Act) after a insurance company has paid losses in excess of an annual aggregate deductible. For 2002, the insurance company deductible is 1% of direct earned premium in the prior year; for 2003, 7% of direct earned premium in the prior year; for 2004, 10% of direct earned premium in the prior year; and for 2005, 15% of direct earned premium in the prior year. The federal share of an insurance company's losses above its deductible is 90%. In the event the United States government participates in losses, the United States government may direct insurance companies to collect a terrorism surcharge from policyholders. The Act does not currently provide for insurance industry or United States government participation in terrorism losses that exceed $100 billion in any one calendar year.

## Definition of Act of Terrorism

The Terrorism Risk Insurance Act defines "act of terrorism" as any act that is certified by the Secretary of the Treasury, in concurrence with the Secretary of State and the Attorney General of the United States:
1. to be an act of terrorism;
2. to be a violent act or an act that is dangerous to human life, property or infrastructure;
3. to have resulted in damage within the United States, or outside of the United States in the case of an air carrier (as defined in section 40102 of title 49, United 17 States Code) or a United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States), or the premises of a United States mission; and
4. to have been committed by an individual or individuals acting on behalf of any foreign person or foreign interest as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

But, no act shall be certified by the Secretary as an act of terrorism if the act is committed as part of the course of a war declared by Congress (except for workers' compensation) or property and casualty insurance losses resulting from the act, in the aggregate, do not exceed $5,000,000.

**These disclosures are informational only and do not modify your bond or affect your rights under the bond.**

Copyright Zurich American Insurance Company 2003

## Power of Attorney
## FIDELITY AND DEPOSIT COMPANY OF MARYLAND

KNOW ALL MEN BY THESE PRESENTS: That the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a corporation of the State of Maryland, by PAUL C. ROGERS, Vice President, and T. E. SMITH, Assistant Secretary, in pursuance of authority granted by Article VI, Section 2, of the By-Laws of said Company, which are set forth on the reverse side hereof and are hereby certified to be in full force and effect on the date hereof, does hereby nominate, constitute and appoint **Mark C. BUNDY, Nancy R. CHUNTA, Tammy A. WARD and William E. CRAWLEY, all of Virginia Beach, Virginia,  EACH** its true and lawful agent and Attorney-in-Fact, to make, execute, seal and deliver, for, and on its behalf as surety, and as its act and deed:  **any and all bonds and undertakings,** and the execution of such bonds or undertakings in pursuance of these presents, shall be as binding upon said Company, as fully and amply, to all intents and purposes, as if they had been duly executed and acknowledged by the regularly elected officers of the Company at its office in Baltimore, Md., in their own proper persons. This power of attorney revokes that issued on behalf of Mark C. BUNDY, Nancy R. CHUNTA, Tammy A. WARD, William E. CRAWLEY, dated February 21, 2003.

   The said Assistant Secretary does hereby certify that the extract set forth on the reverse side hereof is a true copy of Article VI, Section 2, of the By-Laws of said Company, and is now in force.

   IN WITNESS WHEREOF, the said Vice-President and Assistant Secretary have hereunto subscribed their names and affixed the Corporate Seal of the said FIDELITY AND DEPOSIT COMPANY OF MARYLAND, this 29th day of July, A.D. 2003.

ATTEST:                                     **FIDELITY AND DEPOSIT COMPANY OF MARYLAND**



         *T. E. Smith*     *Assistant Secretary*   By:   *Paul C. Rogers*     *Vice President*

State of Maryland  } ss:          **FOR YOUR PROTECTION,**
City of Baltimore  }              **LOOK FOR THE ZURICH  WATERMARK**

   On this 29th day of July, A.D. 2003, before the subscriber, a Notary Public of the State of Maryland, duly commissioned and qualified, came PAUL C. ROGERS, Vice President, and T. E. SMITH, Assistant Secretary of the FIDELITY AND DEPOSIT COMPANY OF MARYLAND, to me personally known to be the individuals and officers described in and who executed the preceding instrument, and they each acknowledged the execution of the same, and being by me duly sworn, severally and each for himself deposeth and saith, that they are the said officers of the Company aforesaid, and that the seal affixed to the preceding instrument is the Corporate Seal of said Company, and that the said Corporate Seal and their signatures as such officers were duly affixed and subscribed to the said instrument by the authority and direction of the said Corporation.

   IN TESTIMONY WHEREOF, I have hereunto set my hand and affixed my Official Seal the day and year first above written.

                    *Dennis R. Hayden*                 *Notary Public*
                 My Commission Expires:  February 1, 2009

POA-F  176-3814



*Environmental Specialists, Inc.*
*Construction Division*

# SUBCONTRACT AGREEMENT
## ESA ENVIRONMENTAL SPECIALISTS INC.

| Subcontractor Name: | Herve Cody Contractor | P O Number | SVA – XXXX- 258 |
|---|---|---|---|
| | P.O. Box 218 | Project Location | Kenansville, Florida |
| | Robbinsville, N.C. 28771 | Phone: | 828-479-6040 |
| Contact: | Mr. Dirk Cody | FAX: | 828-479-3052 |

Subcontract made this 28th day of September, 2005, between ESA Environmental Specialists Inc.(Contractor) a North Carolina State Corporation with principal office at 1100 S. Mint Street, Suite 100, Charlotte, NC 28203 ("Contractor") and **Herve Cody Contractor** a State of North Carolina company(Subcontractor).

"Contractor" and Subcontractor agree as follows:

## Article 1 – The Contract Documents

1.1     The subcontract consists of the following:

> This Agreement and Exhibits
> The Terms and Conditions of the Contract between Contractor and Subcontractor dated the **28th** day of **September, 2005** , pertaining to the construction of **Kenansville Lake Project** , which are attached to this Agreement ("Prime Agreement").
> Contract Specifications: **Dated: August 10, 2005**
> Contract Drawings:        **Dated: August 10, 2005**
> Addendum No.: N/A
> All Change Orders: N/A

In the event of conflict among the documents of this subcontract, the following order of precedence shall prevail:

> Modifications/Change Orders
> This Agreement and Exhibits
> Contract between Owner and Contractor
> Addendum
> Contract Specifications
> Contract Drawings

## Article 2 – The W

2.1 The Subcontractor agrees, at its own cost and expense, to provide labor, fuel, equipment, tools, machinery, supplies, storage trailer and all necessary supervision to perform and complete the requirements of the Contract Documents within the times specified therein, and in accordance with the terms and conditions of the Prime Agreement and this subcontract.  Subcontractor's scope of work is set forth in attached Exhibit A.

2.2 The Subcontractor agrees he shall not communicate with the Owner and the Contractor's subcontractors or suppliers without written approval from ESA Environmental Specialist's Inc.

PLAINTIFF'S
EXHIBIT

"    "B"

**Article 3 – The Contract Sum**

3.1     The Contractor agrees to pay and the Subcontractor agrees to accept, as full compensation, including taxes if applicable, for performance of the Work, subject to additions and deductions by written change order, the total price of **$1,799,340.80**

3.2     This amount includes tax on materials and labor.

**Article 4 – Payment**

4.1     For time and material or unit price work, Contractor will have the right to review Subcontractor records to verify accuracy of invoices, and may request, and Subcontractor shall supply, reasonable supporting documentation for invoices.  Subcontractor shall obtain and retain receipts substantiating expenditures of $25.00 or more.  Subcontractor shall also provide these same audit rights to Contractor in any sub-subcontract entered into by Subcontractor with respect to services provided under this subcontract.

4.2     For prompt acknowledgment invoices shall be sent to:

ESA Environmental Specialists Inc.
ATTN: Accounts Payables
1100 S. Mint St, Suite 100
Charlotte, N.C 28203 .

All invoices to be considered for payment shall include the following:

- Preliminary Invoice prior to the 15th of the month.
- Weekly Certified Payroll as per the wage rate in the Contract Documents.
- Updated schedule
- Certified Partial or Final Release of Lien

4.2.1   The following information shall be required prior to the start of the work.

- Two (2) original executed sub contract agreements
- Certificate of Insurance naming ESA Environmental as additional insured.
- Completed W-9
- Completed Statement and Acknowledgement (SF 1413)


**FOR ESA ACCOUNTING USE ONLY 02-888 / 5300.02**

The information requested in 4.2.1 shall be sent to

ESA Environmental Specialists Inc.
1403 Greenbrier Parkway, Suite 575
Chesapeake, Virginia 23320
Attention: Jackie Bales

The contractor shall make periodic progress payments to the Subcontractor within 10 days of receipt of periodic progress payments by the Contractor from the Owner.  Such payments shall be subsequent to, and contingent upon, receipt of payment from Owner and shall reflect the value of work completed by the Subcontractor less:

- a retainage of **10%**
- the aggregate of previous payments, and
- such other offsets or backchages as may be permitted by this subcontract.

4.3    Contractor to be billed by Subcontractor monthly based on the work completed, as approved by Contractor.  The Contractor must receive Subcontractor progress report by the 15th of each month. Invoices will be submitted by Contractor to the Owner on the 25th of each month. Subcontractor shall remit final invoice for work completed as of the 15th of the month by the last working day of the month. Invoicing received after the last working day of each month will be submitted with the next months invoice to the owner. No partial payment will be paid to subcontractor. Invoicing not approved by owner will be returned to Subcontractor to be corrected to comply with owner's approval. Subcontractor to resubmit new invoice to Contractor after it is corrected.

4.4    The Subcontractor recognizes that the Contractor has no control over the timing of receipt of payment from the Owner and agrees to make no claim against the Contractor should the Owner fail to pay the Contractor within the time for payments set forth in the Contract Documents.

4.5    Subcontractor invoices shall be rendered upon completion of the Project work described in the Scope of Work or at other times expressly provided for in this Subcontract.  Subcontractor shall mail invoices with copies of any supporting documentation required by Contractor to the address shown on this Subcontract.  The Work shall be delivered free from all claims, liens, and charges whatsoever.  Subcontractor agrees that he will duly execute and deliver to Contractor for the benefit of Contractor and Owner a waiver and release of all liens against the Project, the Owner and Contractor, in such form as the Contractor requests, to the extent Subcontractor has been paid or is about to be paid for any part of the Work hereunder and such waiver and release may be required as a simultaneous condition to the right to receive payment hereunder.

4.6    Subcontractor agrees to insert an identical requirement in any subcontract he may enter into with his Subcontractors or material suppliers as permitted herein.  Subcontractor agrees to deliver to Contractor for the benefit of Contractor and Owner waivers and releases of all liens from all sub-subcontractors.  Said waivers and releases of liens are to be included with Subcontractor's request for payment.  Contractor's receipt of such waivers and releases may be required as a simultaneous condition to the right to receive payment hereunder.

4.7    Contractor reserves the right to withhold payments to Subcontractor to assure payment of just claims due and unpaid associated with the Subcontractor's work including claims of loss due to injury or damage to the work caused by the acts of Subcontractor.

**Article 5 – Work Schedule**

5.1     Time is of the essence for this Agreement.  The work shall be performed and completed by the Subcontractor no later than the following schedule.

Start Date: **Notice to Proceed Date** Completion Date: **180 days after NTP**

5.2     The Subcontractor will prepare and submit to Contractor, a detailed project schedule of Subcontractor's work and agrees to periodically update the schedule as requested by Contractor. Schedule shall be provided in electronic format unless otherwise specified herein. Schedule shall be updated every two weeks and such schedule shall be remitted with the monthly invoice.

**Article 6 – Warranty**

6.1     Subcontractor expressly warrants that all materials and equipment furnished and incorporated into the Work furnished by Subcontractor under this subcontract will be new, of merchantable quality and fit for the purpose intended and that the Work shall be of good quality, free from faults and defects and in strict conformance with the Contract Documents. Subcontractor shall install or apply all materials, whether furnished by Contractor to Subcontractor, in strict accordance with the Contract Documents.  No other method shall be permitted or accepted unless specifically authorized in writing by Contractor.  Subcontractor shall supply satisfactory evidence of the kind and quality of the materials and equipment supplied by Subcontractor.

6.2     Subcontractor shall promptly complete, repair or replace, at its own expense, any Work found not to be compliant with the foregoing warranty.  If Subcontractor fails, after reasonable notice, to proceed promptly with correction, repair, or replacement of the defective materials, equipment or Work, Contractor shall correct the same, and charge the cost thereof to Subcontractor and may terminate Subcontractor under this Subcontract.

6.3     Subcontractor guarantees all workmanship, materials and equipment to the extent, and for the period, as is required of Contractor by the Prime Agreement and Contract Documents; and if not otherwise specified, for a period of one year from final completion and acceptance of the entire Project.  The rights and remedies provided in this clause are in addition to the rights and remedies provided by law, equity, or under any other article in this contract.

6.4     Warranty to Owner – All of Subcontractor's warranties and warranty remedies hereunder shall be for the benefit of and shall be enforceable by either Contractor or Owner.

**Article 7 – Safety**

7.1 Subcontractor hereby agrees to conduct all of its activities and operations in compliance with all laws, rules and regulations, including OSHA regulations, pertaining to work site safety and with the most stringent of the Owner's, Contractor's or Subcontractor's Health and Safety procedures and requirements.  Subcontractor warrants and represents that it has thoroughly reviewed for health and safety purposes, the Contract Documents, and the various health and safety requirements applicable to the Work.  Subcontractor warrants and represents that all costs of compliance, including but not limited to, materials, equipment, training, qualified supervision and administration have been considered and are included in the payment set forth in the Contract Sum. The Subcontractor shall report within three (3) days to the Contractor any injury to any of their employees on site.

## Article 8 – Indemnification

8.1    To the fullest extent permitted by law, the Subcontractor shall fully protect, defend, indemnify and save harmless the Contractor against all liability, cost, judgments, damages, including legal fees and expenses, in connection with any claim for death of or injury to any person or damage to any property caused by, or resulting from the negligence of Subcontractor, its agents or employees.

8.2    To the fullest extent permitted by law, the Subcontractor shall fully protect, defend, indemnify and save harmless the Contractor and Owner against all liability, cost, judgments, damages, including legal fees and expenses, in connection with any claims, except those for death, personal injury or property damage, arising from, relating to, or alleged to arise from or relate to, the acts, errors or omissions, of Subcontractor, its agents, employees, sub-subcontractors and material suppliers.

## Article 9 – Insurance

9.1 The Subcontractor agrees to carry, at his own expense, the insurance's shown on the attached Exhibit B. The insurance shall be provided by an insurance company authorized to carry on business under the laws of the State of **Florida** and shall be satisfactory to the Contractor. Subcontractor must furnish to the Contractor prior to the commencement of work, certificates showing that such insurance is in force. Such certificates shall provide that the insurance(s) will not be cancelled or changed without at least 30 days written notice to the Contractor. If Subcontractor fails to furnish and maintain such insurance(s), the Contractor shall have the right to take out and maintain the insurance(s) for and in the name of the Subcontractor.

9.2 Subcontractor agrees to pay the cost thereof and to furnish all necessary information to permit the Contractor to take out and maintain such insurance for the account of the Subcontractor.

## Article 10 – Personnel

10.1    The Subcontractor is to employ persons and mechanics on or relating to the Work who must at all times work in harmony with the persons employed by the Contractor and other subcontractors on the job. Should the Contractor's or the Subcontractor's work for any reason be stopped or materially delayed in the judgment of the Contractor due to the Subcontractor's not having proper persons or mechanics to do the work on the job, then the Contractor shall have the right, after seventy-two (72) hours written notice, to employ such persons or mechanics to complete the work who will work in harmony with the persons and mechanics employed by the Contractor and the other subcontractors and the cost of completing the unfinished part of the Subcontractor's work shall be charged to the Subcontractor.

10.2    Contracts will be awarded and labor employed without discrimination as to whether the employees of any contractor are members or non-member of any labor organization. The Subcontractor agrees that in the event of a work stoppage resulting from a labor dispute directed at the Subcontractor, the Contractor shall have the right to proceed as set for in the preceding paragraph.

10.3    Provide a company representative at all on site project meetings as requested by ESA Environmental Specialists, Inc.

**Article 11 – Remedy of Faulty Work, Backchages and Contract Termination**

11.1    Contractor has the right to correct faulty or damaged work performed by Subcontractor 72 hours after written notification to Subcontractor.  Contractor shall backcharge Subcontractor at a rate of actual cost (including all direct and indirect overhead costs) plus 15%.

11.2    Contractor shall have the right to terminate this Subcontract upon seven (7) days written notice for its convenience.  Contractor shall have the right to terminate this Subcontract upon 48 hours written notice if Subcontractor does not perform in accordance with the terms of this Subcontract.  Contractor's right to terminate may be based on, but is not limited to, the following:

- Subcontractor's failure to supply sufficient numbers of or properly skilled workmen.
- Subcontractor's failure to obey applicable laws, ordinances or obey the orders of the Owner or Contractor.

11.3    Upon termination for cause, Subcontractor shall not be entitled to receive additional payments except as provided in the terms of this Agreement.

**Article 12 – Dispute Resolution**

12.1    The parties agree that in an effort to resolve any conflicts that arise during the design or construction of the project or after completion of the project, all claims, disputes or other matters in question between the parties to this Subcontract that arise out of or relate to this Subcontract or the breach thereof shall be submitted to non-binding mediation before a neutral third-party mediator acceptable to both parties.  Such mediation shall be a condition precedent to the commencement of any legal action arising out of this Subcontract unless waived, in writing by the parties hereto.  The mediation shall be conducted in accordance with the Construction Industry Mediation/Rules of the American Arbitration Association currently in effect unless the parties agree otherwise.

12.2    The cost of the mediator shall be borne equally by the parties.  A demand for mediation shall be made within a reasonable time after the claim; dispute or other matter has arisen.  In no event shall such demand be made after the date applicable statute of limitations or repose would bar a legal or equitable action based on such claim, dispute or other matter.

12.3    In the event litigation should occur, the parties agree that any legal action or proceeding shall be venued in the court having local jurisdiction to the project.

12.4    In the event of litigation relating to the sufficiency or adequacy of performance of services called for by this Subcontract, it is agreed that should Contractor obtain a judgment dismissing Subcontractor's claim or other resolution wherein Contractor is not required to make any compensation to Subcontractor, Contractor shall be entitled to recover reasonable costs incurred in the defense of the claim.

### Article 13 - Conflicts with General Provisions

13.1   If any conflicts occur within this executed Subcontract Agreement and the attached General Provisions, Scope of Work or other attachments listed, it is agreed that the most stringent requirement shall prevail.

### Article 14- Joint Drafting

14.1   The parties to this Subcontract Agreement expressly agree that both had an opportunity to negotiate its terms and to obtain the assistance of counsel in reviewing its terms prior to execution. Therefore, this Subcontract Agreement shall be construed neither against nor in favor of either party, but shall be construed in a neutral manner.

In witness whereof, the parties hereto have executed this Subcontract the date first above written.

Please retain a copy for yourself and return a copy with an original signature to ESA Environmental Specialists Inc.

Contractor: _ESA Environmental Spec._   Subcontractor: _Herve Cody Contractor_
Name: _Nathan Bondon_   Name: _Herve Cody_
Title: _President_   Title: _Owner_
Signature: _____   Signature: _____
Date: _10-19-05_   Date: _10-7-05_

Attachments:
General Conditions
Exhibit A – Scope of Work
Exhibit B – Insurance Requirements
Wage Determination Rates
Certified payroll form with instructions
W-9 Form
Prime Contract Documents
Partial Release of Lien
Final Release of Lien
Statement and Acknowledgement Form SF 1413

# GENERAL CONDITIONS

## SECTION 1
## SUBCONTRACTOR

**1.1     RIGHTS AND RESPONSIBILITIES**

1.1.1    The Subcontractor shall be bound to the Contractor by the terms of this Agreement and, to the extent that provisions of the Contract  Documents between the Owner and Contractor apply to the Work of the Subcontractor as defined in this Agreement, the Subcontractor shall assume toward the Contractor all the obligations and responsibilities which the Contractor, by those Documents, assumes toward the Owner and the Architect, and shall have the benefit of all rights, remedies and redress against the Contractor which the Contractor, by those Documents, has against the Owner, insofar as applicable to this Subcontract, provided that where any provision of the Contract Documents between the Owner and Contractor is inconsistent with any provision of this Agreement, this Agreement shall govern.

1.1.2    The Subcontractor shall not assign this subcontract without the written consent of the Contractor, nor subcontract the whole of this Subcontract without the written consent of the Contractor, nor further subcontract portions of this Subcontract without written notification to the Contractor when such notification is requested by the Contractor. The Subcontractor shall not assign any amounts due or to become due under this Subcontract without written notice to the Contractor.

**1.2     EXECUTION AND PROGRESS OF THE WORK**

1.2.1    The Subcontractor agrees that the Contractor's equipment will be available to the Subcontractor only at the Contractor's discretion and on mutually satisfactory terms.

1.2.2    The Subcontractor shall cooperate with the Contractor in scheduling and performing his Work to avoid conflict or interference with the work of others.

1.2.3    The Subcontractor shall promptly submit shop drawings and samples required in order to perform his Work efficiently, expeditiously and in a manner that will not cause delay in the progress of the Work of the Contractor or other subcontractors.

1.2.4    The Subcontractor shall furnish biweekly progress reports on the Work as mutually agreed, including information on the status of materials and equipment under this Subcontract which may be in the course of preparation or manufacture.

1.2.5    The Subcontractor agrees that all Work shall be done subject to the final approval of the Architect. The Architect's decision in matters relating to artistic effect shall be final if consistent with the intent of the Contract Documents.

1.2.6    The Subcontractor shall pay for all materials, equipment and labor used in, or in connection with, the performance of this Subcontract through the period covered by previous payments received from the Contractor, and shall furnish satisfactory evidence, when requested by the Contractor, to verify compliance with the above requirements.

**1.3     LAWS, PERMITS, FEES AND NOTICES**

1.3.1     The Subcontractor shall give all notices and comply with all laws, ordinances, rules, regulations and orders of any public authority bearing on the performance of the Work under this Subcontract.  The Subcontractor shall secure and pay for all permits and governmental fees, licenses and inspections necessary for the proper execution and completion of the Subcontractor's Work, the furnishing of which is required of the Contractor by the Contract Documents.

1.3.2     The subcontractor shall comply with Federal, State and local  tax laws, social security acts, unemployment compensation acts and workers' or workmen's compensation acts insofar as applicable to the performance of this Subcontract.

**1.4     WORK OF OTHERS**

1.4.1     In carrying out his Work, the Subcontractor shall take necessary precautions to protect properly the finished work of other trades from damage caused by his operations.

1.4.2     The Subcontractor shall cooperate with the Contractor and other subcontractors whose work might interfere with the Subcontractor's Work, and shall participate in the preparation of coordinated drawings in areas of congestion as required by the Contract Documents specifically noting and advising the Contractor of any such interference.

**1.5     SAFETY PRECAUTIONS AND PROCEDURES**

1.5.1     The Subcontractor shall take all reasonable safety precautions with respect to his Work, shall comply with all safety measures initiated by the Contractor and with all applicable laws, ordinances, rules, regulations and orders of any public authority for the safety of persons or property in accordance with the requirements of the Contract Documents. The Subcontractor shall report within three days to the Contractor any injury to any of the Subcontractor's employees at the site.

**1.6     CLEANING UP**

1.6.1     The Subcontractor shall at all time keep the premises free from accumulation of waste materials or rubbish arising out of the operations of the Subcontract. Unless otherwise provided, the Subcontractor shall not be held responsible for unclean conditions caused by other contractors or subcontractors.

**1.8     CHANGES IN THE WORK**

1.8.1     The Subcontractor may be ordered in writing by the Contractor, without invalidating this Subcontract, to make changes in the Work within the general scope of this Subcontract consisting of additions, deletions or other revisions, the Contract Sum and the Contract Time being adjusted accordingly. The Subcontractor, prior to the commencement of such changed or revised Work, shall submit promptly to the Contractor written copies of any claim for adjustment to the Contract Sum and Contract Time for such revised Work in a manner consistent with the Contract Documents.

## 1.9    CLAIMS OF THE SUBCONTRACTOR

1.9.1 To the Subcontractor shall make all claims promptly to the Contractor for additional cost, extensions of time, and damages for delays or other damages for delays or other causes in accordance with the Contract Documents. Any such claim which will affect or become part of a claim which the Contractor is required to make under the Contract Documents within a specified time period or in a specified manner shall be made in sufficient time to permit the contractor to satisfy the requirements of the Contract Documents. Such claims shall be received by the Contractor not less than two working days preceding the time by which the Contractor's claim must be made. Failure of the Subcontractor to make such a timely claim shall bind the Subcontractor to the same consequences as those to which the contractor is bound.

## 1.10    INDEMNIFICATION

1.10.1 To the fullest extent permitted by law, the Subcontractor shall indemnify and hold harmless the Owner, the Architect and the Contractor and all of their agents and employees from and against all claims, damages, losses and expenses, including but not limited to attorney's fees, arising out of or resulting from the performance of the Subcontractor's Work under this Subcontract, provided that any such claim, damage, loss, or expense is attributable to bodily injury, sickness, disease, or death, or to injury to or destruction of tangible property (other than the Work itself) including the loss of use resulting therefrom, to the extent caused in whole or in part by any negligent act or omission of the Subcontractor or anyone directly or indirectly employed by him or anyone for whose acts he may be liable, except to the extent it is caused in part by a party indemnified hereunder. Such obligation shall not be construed to negate, or abridge, or otherwise reduce any other right or obligation of indemnity which would otherwise exist as to any party or person described in this Paragraph

1.10.2 In any and all claims against the Contractor or any of their agents or one directly or indirectly employed by him or any one for whose acts he may be liable, the indemnification obligation under this Section 1.10 shall not be limited in any way to by any limitation on the amount or type of damages, compensation or benefits payable by or for the Subcontractor under worker's or workmen's compensation acts, disability benefit acts or other employee benefit acts.

1.10.3 The obligations of the Subcontractor under this Section 1.10 shall not extend to the liability of the Contractor, his agents or employees arising out of (1) the preparation or approval of maps, drawings, opinions, reports, surveys, Change Orders, designs or specifications, or (2) the giving of or the failure to give directions or instructions by the Contractor, his agents or employees provided such giving or failure to give is the contributing cause of the injury or damage.

## 1.11    SUBCONTRACTOR'S REMEDIES

1.11.1 If the Contractor does not pay the Subcontractor through no fault of the Subcontractor, within seven days from the time payment should be made as provided in Paragraph 12.4, the Subcontractor may, without prejudice to any other remedy he may have, upon seven additional days' written notice to the Contractor, stop his Work until payment of the amount owing has been received. The Contract Sum shall, by appropriate adjustment, be increased by the amount of the Subcontractor's reasonable costs of shutdown, delay and start-up.

**SECTION 2**
**CONTRACTOR**

**2.1    RIGHTS AND RESPONSIBILITIES**

2.1.1    The Contractor shall be bound to the Subcontractor by the terms of this Agreement, and to the extent that provisions of the Contract Documents between the Owner and the Contractor apply to the Work of the Subcontractor as defined in this Agreement, the Contractor shall assume toward the Subcontractor all the obligations and responsibilities that the Owner, by those Documents assumes towards the Contractor, and shall have the benefit of all rights, remedies and redress against the Subcontractor which the Owner, by those Documents, has against the Contractor.

**2.2    SERVICES PROVIDED BY THE CONTRACTOR**

2.2.1    The Contractor shall cooperate with the Subcontractor in scheduling and performing his Work to avoid conflicts or interference in the Subcontractor's Work, and shall expedite written responses to submittal made by the Subcontractor in accordance with Contract Documents. As soon as practicable after execution of this Agreement, the Contractor shall provide the Subcontractor a copy of the estimated progress schedule of the Contractor's entire Work which the Contractor has prepared and submitted for the Owner's and the Architect's information, together with such additional scheduling details as will enable the Subcontractor to plan and perform his Work properly. The Subcontractor shall be notified promptly of any subsequent changes in the progress schedule and the additional scheduling details.

2.2.2    The Contractor shall provide suitable areas for storage of the Subcontractor's materials and equipment during the course of the Work. Any additional costs to the Subcontractor resulting from the relocation of such facilities at the direction of the Contractor shall be reimbursed by the Contractor.

**2.3    COMMUNICATIONS**

2.3.1    The Contractor shall promptly notify the Subcontractor of all modifications to the Contract between the Owner and the Contractor which affect this Subcontract and which were issued or entered into subsequent to the execution of this Subcontract.

2.3.2    The Contractor shall not give instructions or orders directly to employees or workmen of the Subcontractor except to persons designated as authorized representatives of the Subcontractor.

2.3.3    The Subcontractor shall not perform any work as directed by the Owner unless such direction is in written form and submitted to them from the Contractor.

2.3.4    The Subcontractor shall not have direct communication of any form with the Owner unless the Subcontractor has received written permission for each occurrence from the Contractor.

**2.4      PAYMENTS TO THE SUBCONTRACTOR**

2.4.1     Unless otherwise provided in the Contract Documents, the Contractor shall pay the Subcontractor each progress payment and the final payment under this Subcontract within ten working days after he receives payment from the Owner, except as provided in Subparagraph 2.4.3. The amount of each progress payment to the Subcontractor shall be the amount to which the Subcontractor is entitled, reflecting the percentage of completion allowed to the Contractor for the Work of this Subcontractor applied to the Contract Sum of this Subcontract, and the percentage actually retained, if any, from payments to the Contract on account of such Subcontractor's work, plus, to the extent permitted by the Contract Documents, the amount allowed for materials and equipment suitably stored by the Subcontractor, less the aggregate of previous payments to the Subcontractor.

2.4.2     The Contractor upon receiving written request and approval shall permit the Subcontractor to request directly from the Owner information regarding the percentages of completion or the amount certified on account of Work done by the Subcontractor.

2.4.3     If the Owner does not issue a Certificate for Payment or the Contractor does not receive payment for any cause which is not the fault of the Subcontractor, the Contractor pay the Subcontractor, on demand a progress payment computed as provided in Subparagraph 2.4.1 or the final payment as provided in Article 4.

**2.5      CLAIMS BY THE CONTRACTOR**

2.5.1     The Contractor shall make no demand for liquidated damages for delay in any sum in excess of such amount as may be specifically named in this Subcontract, **($765.00)** and liquidated damages shall be assessed against this Subcontractor only for his negligent acts and his failure to act in accordance with the terms of this Agreement, and in no case for delays or causes arising outside the scope of this subcontractors are responsible.

2.5.2     Except as may be indicated in this Agreement, the Contractor agrees that no claim for payment for services rendered or materials and equipment furnished by the Contractor to the Subcontractor shall be valid without prior notice to the Subcontractor and unless written notice thereof is given by the Contractor to the Subcontractor not later than the tenth day of the calendar month following that in which the claim originated.

# Exhibit A
# Scope of Work

**Herve Cody Contractor** shall provide the material, labor, equipment, insurance and any and all other appurtenances to furnish and install a complete **Kenansville Lake Project** in accordance with and as specified in the Contract Documents **W912EP-04-R-0034** dated **August 10, 2005**. The Contract Documents are incorporated in whole into this contract. All requirements stated therein are also the requirements of this contract except as noted below under Excluded from this Contract. The following is a partial list of requirements only.

1.  Provide a Health and Safety Plan.
2.  Provide a full time site superintendent
3.  Provide a company representative for all on site progress meetings with the owner. The representative shall attend project meetings as part of this contract..
4.  Work hours on site shall be coordinated with the owner before construction begins.
5.  Provide daily reports to the ESA on site representative by 8:00 AM the following day.
6.  Payment and Performance Bond.
7.  Provide a minimum of 7 shop drawings in accordance with the Contract Documents.
8.  Provide ESA Environmental Specialists before the first invoice a breakdown of labor and materials for approval for each item of work to be invoiced.
9.  Subcontractor shall note that no work can start until all insurance requirements are in place and approved.
10. Furnish and install a 72" culvert with valve.
11. Provide a dry working environment for the placing of the pipe and valve.
12. Provide layout and engineering for all installations of the work. ESA will provide a benchmark
13. Furnish and install the steel walkway to the valve.
14. Furnish and install coal tar epoxy coated PZ27 steel weir structure.
15. Furnish and install safety barriers and signs.
16. Furnish and install excavation and backfill at pipe and weir.
17. Furnish and install a rip rap spillway including bedding stone, clearing and excavation of flow channel.
18. Hauling and onsite disposal of excavated materials.
19. Furnish and install seeding,
20. Furnish dewatering of the work area and weir access.
21. Furnish and maintain a trailer on job site.

## Excluded from this contract

*   Matting for ground to Flow Way area has been removed from contract.
*   Should matting be required because of field conditions the cost shall be an **ADD** of $75,000.00

# EXHIBIT B
## INSURANCE REQUIREMENTS

Each Subcontractor agrees to carry at his own cost and expense and for the benefit of ESA Environmental Specialists Inc. (in addition to the coverage required in other sections of this contract):

1. Comprehensive General Liability Insurance providing coverage for the Subcontractor in the form as herein above required of the Contractor including Contractor's Protective Liability Insurance, Completed Operations Insurance, Products Liability Insurance and Contractual Liability Insurance, Broad Form Property Damage, Contractor's Per Project Aggregate Endorsement CG2503, Blanket XCU, Employees as insured's, and Full Underground Coverage.

   Limit of Liability    **$1,000,000** per Occurrence
   **$2,000,000** Aggregate

   Coverage to include Contractual Liability covering liability assumed by Subcontractor under the indemnification provision contained in this Agreement.

   Complete Operations Coverage to remain in effect for two full years following final acceptance by Owner.

2. Comprehensive Automobile Liability Insurance providing coverage for the Subcontractor and agents as herein above required of the Contractor including hired and non-owned vehicles either rented or borrowed by Contractor of employees of the Contractor.

   Limit of Liability       **$1,000,000**
   Bodily Injury and Property Damage Combined Single Limit

3. Statutory Workmen's Compensation, Employers' Liability and Disability Benefits, Policies to afford coverage in state where work is performed.

   Employers' Liability Limit - **$1,000,000**

4. Umbrella Liability -       **$2,000,000**

5. Additional Insured coverage to be provided for ESA Environmental Specialists, Inc. on all policies except Worker's Compensation and Disability Benefits. This must be listed on the Certificate of Insurance. A copy of this certificate should be faxed to 757-547-3060 – Attn: Jackie Bales and the original should be mailed to the Certificate Holder.

   Please note that on your Certificate of Insurance, the Certificate Holder shall be:

   ESA Environmental Specialists, Inc.
   1100 S. Mint Street, Suite 100
   Charlotte, NC 28203

6.  Each policy shall be primary with respect to any other insurance.  Such insurance coverage shall be by a casualty insurance company authorized under the laws of the State of **Florida** with a Best Rating of A XII and satisfactory to Contractor.  The insurance policies shall make reference to this Contract.  The Subcontractor shall furnish Contractor prior to the commencement of operations hereunder a properly executed copy of an Accord Form "Certificate of Insurance" in the form required by Contractor or Contractor's Insurance Carrier, or copies of such policies showing that all insurance required under this contract is in force.  Such certificates or policies shall provide that the insurance will not be canceled or changed until after at least thirty (30) days written notice (10 days written notice for non-payment of premium) to Contractor.

7.  In the event of the failure of the Subcontractor to furnish and maintain such insurance, Contractor shall have the right to take out and maintain such insurance for and in the name of the Subcontractor and the Subcontractor agrees to pay the cost thereof and to furnish all necessary information to permit Contractor to purchase and maintain such insurance for the account of the Subcontractor and agents.  Compliance by the Subcontractor with the foregoing requirements to carry insurance and furnish certificates shall not relieve the Subcontractor from liability under any provision of this Contract.  This provision shall survive the Contract.

The Subcontractor shall also verify to Contractor payments of all premiums for the coverage period certified.

Coverage supplied by Subcontractor shall be primary and waive the rights of subrogation against ESA Environmental Specialists Inc.